**MEDICAL EMERGENCY SERVICE ASSOCIATES, S.C., an Illinois Medical Corporation, Plaintiff–Appellant, Cross–Appellee,**

v.

**Douglas J. FOULKE, M.D., Howard J. Croft, M.D., Julio A. Mancera, M.D., William Helvey, M.D., individuals; and Waukegan Associates, Ltd., an Illinois professional corporation, Defendants–Appellees, Cross–Appellants.**

Nos. 86–1174, 86–2070 and 86–2132.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1987.

Decided March 25, 1988.

Rehearing Denied May 10, 1988.

Michael P. Mullen, Burke, Griffin, Chomicz & Wienke, P.C., Chicago, Ill., for plaintiff-appellant, cross-appellee.

Jeffrey D. Colman, Jenner & Block, Chicago, Ill., for defendants-appellees, cross-appellants.

Before WOOD, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff-appellant Medical Emergency Service Associates ("MESA") appeals the trial court's dismissal of its cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against four physicians formerly associated with MESA. MESA also appeals the court's award of Rule 11 sanctions against it, and the defendants cross-appeal the sanction award. We affirm.

## I.

MESA provides medical staff to the emergency departments of various hospitals. In September, 1978, MESA contracted with Victory Memorial Hospital to furnish its emergency room staff. MESA and Victory Memorial renewed the contract annually, and it remained in effect until September 30, 1984.

As required under the contract, MESA entered into "individual contracts of em-

ployment" with each of the defendant doctors, and assigned them to Victory Memorial. Defendant Douglas J. Foulke, M.D., as "unit head" of MESA at Victory Memorial, was responsible for the supervision of those MESA employees who provided emergency medical services at the hospital. Dr. Foulke also made regular reports to MESA on the status of its endeavors at Victory Memorial.

According to MESA's complaint, one or more of the named defendants Foulke, Croft, Mancera, and Helvey, while under employment contracts with MESA, conceived and embarked upon a plan to form another medical supporting unit to replace MESA as the provider of emergency medical services at Victory Memorial Hospital. MESA alleges that the individual defendants conspired with each other to accomplish the following acts of fraud in furtherance of the scheme:

"(a) to form a corporation, controlled by defendants, to replace MESA as the provider of emergency medical services for Victory Memorial Hospital;

(b) to terminate each of their individual employment contracts with MESA simultaneously;

(c) to encourage Victory Memorial Hospital to terminate its contractual relationship with MESA and to enter into a similar agreement with defendants for the provision of these services;

(d) to disable MESA's operation at Victory Memorial Hospital, by terminating their contracts simultaneously so that MESA would not be able to compete with Waukegan Associates, Ltd. or any other potential competitor;

(e) to induce other physicians and other MESA employees to terminate their contracts with MESA simultaneously with defendants;

(f) to provide fraudulent reports to MESA without disclosing the scheme and to deceive MESA into believing that its relationship with Victory Memorial Hospital was not at risk or about to be terminated;

(g) to conceal any of the acts set forth here, all with the purpose of deceiving MESA and concealing from it the existence of the scheme until June 28, 1984;

(h) on May 22, 1984, to make incomplete disclosures and misleading and deceptive reports about communications Dr. Foulke had with Victory Memorial Hospital administrators regarding the continuation of the relationship between MESA and Victory Memorial Hospital and to conceal such communications."

MESA alleges that the defendants formed their own company (Waukegan Associates Ltd.) and without MESA's knowledge or consent reached an agreement to provide emergency medical services to Victory Memorial, thus replacing MESA as the provider of those services. In furtherance of this scheme, MESA also alleges that the defendants knowingly caused multiple mailings to be placed in the United States mails, with each mailing designated as a "predicate act" of mail fraud under 18 U.S.C. § 1961. As an example, MESA recites in its complaint that the "defendants caused false and fraudulent unit director reports and other written reports, and letters of notification of termination of contracts to be mailed and sent through the mails in furtherance of the scheme to defraud ... [and] caused paychecks in payment of services rendered to be paid to physician defendants, which paychecks were part of the proceeds and secret profits of the scheme alleged herein." MESA asserts that this combination of alleged conspiratorial activities constitutes a "pattern of racketeering activity" under section 1961 of the RICO Act.

Each of the defendants moved to dismiss the complaint on the ground that MESA failed to: (1) allege fraud with particularity; (2) allege mailings in furtherance of a scheme to defraud; and (3) adequately allege the existence of a "pattern of racketeering activity" as required by section 1961. On January 6, 1986, the district court, relying on the Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), our opinion in *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir.1985), the district court's ruling in *Northern Trust*

*Bank/O'Hare, N.S. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985) and the trial judge's own decision in *Graham v. Slaughter,* 624 F.Supp. 222 (N.D.Ill.1985), ruled that MESA had failed to allege a "pattern of racketeering activity" as set forth in the federal RICO statute. In holding that MESA's complaint failed to allege a "pattern" of illegal activity under the Act, the district court noted:

> "In this case there is a single wrongful transaction and a single injury. The loss to MESA occurred when the defendant doctors broke with MESA and created (or joined) Waukegan in connection with the rendering of emergency room medical services to Victory Memorial. Although numerous mailings are alleged in furtherance of the scheme, and assuming that each would constitute a separate offense and a separate predicate act, each mailing did not result in a separate injury or separate transaction. Accordingly, each mailing is not a separate criminal episode."

633 F.Supp. 156, 157. Since the date of the trial court's decision, this court has had further occasion to define and clarify the contours of the RICO "pattern" standard and thus illustrate its application in a variety of factual settings.

## II.

■ Section 1964 of RICO authorizes a private plaintiff to bring a civil suit based on a violation of section 1962. "A crucial element of a section 1962 claim, however, is the existence of a pattern of racketeering." *Elliott v. Chicago Motor Club Ins.,* 809 F.2d 347, 349 (7th Cir.1986). This footnote to the Supreme Court's decision in *Sedima* established a starting point for our Circuit's current definition of the "pattern" requirement:

> "the definition of a 'pattern of racketeering activity' differs from the other provisions in § 1961 in that it states that a pattern *'requires* at least two acts of racketeering activity,' § 1961(5) (emphasis added), not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient.... The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: 'The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern.' S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that '[t]he term "pattern" itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity without more, does not establish a pattern....' 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.,* at 35193 (statement of Rep. Poff) (RICO 'not aimed at the isolated offender'); House Hearings, at 665. Significantly, in defining 'pattern' in a later provision of the same bill, Congress was more enlightening: 'criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975)."

473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. Following these guidelines in *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322, 323 (7th Cir.1986), we held that multiple fraudulent representations inducing the sale of a large block of stock did not constitute a "pattern" of fraudulent representations where the acts (1) occurred within a short period of time, (2) were related to a single transaction (inducing the stock sale), (3) involved a single victim, and (4) inflicted a single injury. Focusing on the Supreme Court's statement in footnote 14 of *Sedima* that "[i]t is this factor of *continuity plus*

*relationship* which combines to produce a pattern," we stated that:

> "A pattern of racketeering activity requires at the barest minimum two 'acts of racketeering activity.' 18. U.S.C. § 1961(5). In general, however, much more than two such acts must be shown in order to demonstrate a pattern.... *The separate racketeering acts must reflect both 'continuity' and 'relatedness' in order to constitute a pattern."*

803 F.2d at 323 (emphasis added).

In *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986), this court acknowledged the theoretical soundness of requiring both "continuity" *and* "relationship" among the predicate acts. We also recognized that because the concepts of pattern and relationship are inherently contradictory, their simultaneous application to a given factual situation is often difficult in practice. *Id.* As the court explained, "relationship" implies that the predicate acts involve the same victim or type of misconduct or were committed closely in time, while the term "continuity" can be read to comprise predicate acts involving different victims or occurring at different points in time. 804 F.2d at 975. As such, this Circuit held that the existence of a "pattern" as required by RICO must not focus excessively on either continuity or relationship, but rather must take into account both elements. Thus, in order for the predicate acts to be sufficiently continuous to amount to a pattern of racketeering activity, "the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, i.e. 'transactions somewhat separated in time and place.'" *Id.* (quoting *Graham v. Slaughter,* 624 F.Supp. 222, 225 (N.D.Ill.1985)). And at the same time, there must be a "relationship among activities—i.e., activities leading up to coordinated action." *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809 (7th Cir.1987). This inquiry is fact-specific and encompasses a variety of factors, including the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes,

and the occurrence of distinct injuries. *Morgan,* 804 F.2d at 975.

The facts of *Morgan* illustrate the type of activity required to meet both the continuity and relationship prongs of the pattern requirement. In *Morgan,* the defendants (in April of 1978) allegedly made various false representations to the plaintiffs in order to induce them to invest in a series of corporations, to guarantee loans of the venture, and to pledge their home as additional security for the venture. Subsequently, a Bank (also named as a defendant) agreed to lend money to the venture on the condition that the plaintiffs convey a beneficial interest in their home to the Bank and sign various guarantees. The plaintiffs alleged that in August, 1980, after the venture was in default, the defendants removed substantial assets of the venture, formed their own company (Waukegan Drugs), and purchased the remaining assets of the venture at a foreclosure sale. The Bank loaned money to Waukegan Drugs in exchange for a note and a security interest in the venture's remaining assets. Seventeen months later, the same scenario was repeated. Waukegan Drugs defaulted on its August, 1980 loan, formed a new corporation, and purchased the assets of Waukegan Drugs at a second foreclosure sale. A deficiency remained, however, and the Bank commenced an action to assume ownership of plaintiffs' home in order to repay this debt. The plaintiffs filed a RICO action against the various defendants. *Id.* at 972.

Applying the continuity aspect of the pattern requirement to these facts, the *Morgan* court noted that the plaintiff alleged distinct acts of mail fraud occurring at separate points in time: some relating to two separate foreclosure sales that took place seventeen months apart, and others made relating to allegedly fraudulent statements in connection with a loan transaction. Thus, the court ruled that the plaintiff had alleged separate and distinct episodes of fraud. Because these distinct fraudulent transactions also led to a coordinated scheme to defraud the plaintiff, the court held that the plaintiff satisfied the

continuity as well as the relationship prongs of the RICO pattern requirement. Contrasting those facts with *Lipin,* the court explained:

"In *Lipin,* the plaintiff alleged that the defendants defrauded him as part of a single acquisition of over $960,000 worth of stock. It is true that plaintiff was able to point to multiple predicate acts: a false statement made during negotiations for the sale, false financial statements, a false opinion letter from the attorneys, false financial statements, and a false statement that the financial statements were accurate. The existence of multiple predicate acts in *Lipin,* however, is only because the acquisition of stock in this context is a complicated transaction that requires many separate statements from a variety of persons: financial statements from the accountants, opinions from the lawyers, oral statements from the parties negotiating the sale, and so forth. All of these predicate acts still relate to but a single act: an acquisition of a large block of stock. The mere fact that the complexity of the transaction generates numerous pieces of paper and hence a greater number of possible fraudulent acts does not make these predicate acts ongoing over a period of time so as to constitute separate transactions that are distinct in time and place. *Since these predicate acts were all made in a fairly short period of time* (several months), *and all clearly relate to the same transaction* (the acquisition of a large block of stock), *involve a single scheme and a single victim, and create a single injury, the acts in Lipin do not satisfy the continuity aspect of the pattern of racketeering activity.*"

804 F.2d at 976–77 (emphasis added).

Our more recent cases serve to further illustrate the application of the standards set forth in *Lipin* and *Morgan.* In *Elliot v. Chicago Motor Club Ins.,* 809 F.2d 347 (7th Cir.1986), we held that a pattern could not be established based upon allegations of multiple acts of mail fraud that all related to plaintiff's attempt to settle one claim under their uninsured motorist insurance policy. We explained that:

"In the case at hand, the Elliotts have alleged that the defendants committed several acts of mail fraud over a period of several years in furtherance of an overall scheme to defraud them. These acts of alleged mail fraud were not distinct, however, because they all related to the Elliotts' attempt to settle one claim under their uninsured motorist insurance policy.

.    .    .    .    .

Likewise, any argument that there were five victims because five family members were injured in the car accident is not persuasive. All of the family members' claims arise from the same automobile accident and the same insurance policy. Their injuries are not distinct, as they derive from Chicago Motor Club's failure to settle their claim. *Because these predicate acts all clearly relate to the same transaction involving a single insurance policy and arising out of one accident, the acts do not support the continuity aspect of the pattern of racketeering.*"

809 F.2d at 350 (emphasis added). Other cases holding the allegations of a complaint insufficient to support a RICO action include: *Tellis v. U.S. Fidelity & Guaranty Co.,* 826 F.2d 477, 479 (7th Cir.1987) (multiple predicate acts relating to the defendant's single effort to induce plaintiff to settle his worker's compensation claim that involved a single victim, inflicted a single injury, and occurred within a two-month period); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 818 (7th Cir.1987) (alleged fraudulent representations leading up to the formation of a single contract and the transfer of a single business opportunity); *Marks v. Pannell Kerr Forster,* 811 F.2d 1108, 1122 (7th Cir.1987) (multiple predicate acts relating to a single scheme to defraud a single individual of his interests in twenty-one related partnerships).

The facts of this case parallel those of *Lipin* and *Elliot.* As in those cases, the multiple predicate acts alleged in MESA's complaint relate to the same transaction

(the defendant's replacement of MESA as the provider of emergency room services to Victory Memorial), involved a single victim, inflicted a single injury, and essentially occurred within a two month period. Hence, the predicate acts herein, as in *Lipin* and *Elliot,* cannot reasonably be characterized as amounting to separate and distinct transactions in time and place within the parameters of our recent decisions. It is self-evident that the acts of fraud alleged in MESA's complaint relate "to a single scheme to defraud a single victim in what appears to be a 'one-shot' effort to inflict a single injury." *Marks,* 811 F.2d at 1112. Thus, these acts fail to support the continuity prong of the *Morgan* test.

Attempting to overcome the deficiency in continuity among the alleged fraudulent acts, MESA argues that the defendants' plan to outmaneuver MESA and interfere with its contractual relationship with Victory Memorial should not be viewed as a single transaction, but rather as a coordinated effort to defraud employing a number of distinct "subschemes." MESA contends that the existence of separate subschemes demonstrates the necessary continuity among the acts of fraud committed to carry out the defendants' overall plan to defraud the plaintiff. MESA points out that paragraphs 36 and 37 of their complaint specifically allege separate and distinct acts of fraud causing separate injuries to MESA. Paragraphs 36 and 37 allege:

"36. MESA is informed and believes that the defendants and each of them caused false and fraudulent unit director and other written reports, and letters of notification of termination of contracts to be mailed and sent and delivered according to the directions thereon by the United States Postal Service to Medical Emergency Service Associates, S.C. MESA, 15 S. McHenry Road, Suite 2, Buffalo Grove, Illinois 60090, in the Northern District of Illinois, on more than three (3) occasions, which mailings were in furtherance of the scheme to defraud.

37. MESA is informed and believes that the defendants and each of them caused paychecks in payment of services rendered to physician defendants, which paychecks were part of the proceeds and secret profits of the scheme to defraud here alleged to be mailed and delivered according to the directions thereon by the United States Postal Service from 15 S. McHenry Road, Buffalo Grove, Illinois 60090, on more than three (3) occasions, which mailings were in furtherance of the scheme to defraud."

MESA maintains that the charges leveled in paragraphs 36 and 37 should be viewed as constituting separate and self-contained episodes of fraudulent activity. Although not stated in the text of paragraph 36 itself, counsel for MESA explained at oral argument that the written reports referred to in that paragraph (36) were fraudulent because the defendants breached fiduciary obligations they owed to MESA in failing to disclose in those reports their intention to terminate their employment. MESA contends that the defendants' repeated failure to disclose their true intentions in those reports should be characterized as a distinct transaction for RICO purposes. Similarly, MESA argues that the acts alleged in paragraph 37, reciting the defendants' continuing failure to notify MESA of their intention to disassociate themselves from MESA while accepting payment for their services—amounted to a singular episode of mail fraud. In splitting up each of these alleged sets of fraudulent acts, MESA theorizes without basis in law that each set of acts should be viewed as separate and distinct "subschemes" causing separate injuries to MESA, thereby satisfying the continuity aspect of the pattern of racketeering activity requirement.

Even assuming that the acts alleged in paragraphs 36 and 37 would amount to acts of mail fraud, we are not persuaded that MESA's attempt to characterize these groups of acts as distinct "subschemes" fulfills the continuity aspect of the pattern requirement. In reality, any "scheme" to defraud can be broken down into its component acts and labeled "subschemes." A label, however, is not dispositive: "the doctrinal requirement of a pattern of racketeering activity is a standard, not a rule,

and as such its determination depends on the facts and circumstances of the particular case...." *Morgan*, 804 F.2d at 976. While MESA can point to a number of predicate acts of mail fraud in furtherance of the alleged scheme to defraud MESA, the fact remains that each of these acts relate to but a single episode of alleged wrongdoing—defendants' attempt to replace MESA as the provider of emergency room services to Victory Memorial Hospital—and resulted in a single injury to MESA (the loss of its contract with Victory Memorial). *See Skycom*, 813 F.2d at 818. The instant scenario involves the type of "isolated event" that fails to manifest the threat of *continuing illegal activity* indicative of a "pattern" of racketeering activity. *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. As such, the acts of fraud alleged in the plaintiff's complaint fail to satisfy the "continuity" aspect of the pattern of racketeering activity requirement, and the district court properly dismissed MESA's complaint on this basis.

### III.

At trial, defendants Croft, Mancera and Helvey moved for sanctions under Federal Rule of Civil Procedure 11[1] because an admittedly inaccurate segment of the plaintiff's complaint alleged that those three defendants were "employees" of MESA who owed fiduciary duties to MESA, when in fact their written contracts specified that they were independent contractors. The trial court properly noted that the defendants' true employment status was material to MESA's mail fraud theory as MESA's claims for breach of fiduciary duty was premised upon that status.

Finding that the plaintiff's pleading error constituted a "clear Rule 11 violation," the trial judge stated that:

> "the complaint erroneously alleges a specific contractual relationship between each of the movants and the plaintiff, and the contracts surely were in plaintiff's possession before suit was filed. The contracts obviously were not read before suit was filed, and no other explanation in support of the allegations in the complaint are offered by the plaintiff. Accordingly, there is a clear Rule 11 violation and the movants shall be awarded the fees incurred in connection with investigating the facts concerning the relationship between movants and MESA and the filing and briefing of the Rule 11 motion. Fees for the defense of the lawsuit will not be awarded."

The court awarded the defendants $1,500 in fees incurred in the preparation of their Rule 11 motion.

MESA urges this court to overturn the district court's sanction and overlook the inadvertent misstatements contained in its complaint, because: (1) at least one of the doctors, Dr. Foulke, was in fact a MESA employee who owed fiduciary duties to

---

**1.** Rule 11 provides:

"Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. The party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed properly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the Court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorneys' fee." Fed.R.Civ.P. 11.

MESA (contrary to the other three defendants, Dr. Foulke's contract specified that he was an "employee" of MESA), (2) the remainder of the complaint was well grounded in fact, and (3) upon learning of the mistake, MESA immediately contacted the defendants' counsel in an attempt to resolve the problem. (The record reveals that defense counsel decided to file a Rule 11 motion rather than attempt a private resolution of the problem). MESA notes that the pleading error resulted from counsel's reviewing only Dr. Foulke's employment contract before alleging each defendant's employment status (or lack thereof).

In *Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1434 (7th Cir. 1987), we explained that our review of a trial judge's order granting or denying Rule 11 sanctions involves several discrete inquiries:

"First, we must consider whether the district court correctly imposed sanctions. We review findings of fact that the district court used to determine whether Rule 11 was violated under the clearly erroneous standard. *See, e.g., Kurkowski v. Volcker*, 819 F.2d 201, 203 n. 8 (8th Cir.1987); *Zuniga v. United Can Co.*, 812 F.2d 443, 452 (9th Cir.1987); *Robinson [v. National Cash Register Co.]*, 808 F.2d [1119] at 1126 [5th Cir. 1987]; *Golden Eagle [Distributing Corp. v. Burroughs Corp.]*, 801 F.2d at [1531] 1538 [9th Cir.1986]. However, we review *de novo* the district court's legal conclusion that conduct in a particular case constituted a violation of Rule 11. *See, e.g., Szabo Food Service, Inc., [v. Canteen Corp.]*, 823 F.2d 1073 [7th Cir. 1987] (applying *de novo* standard without discussion); *Kurkowski*, 819 F.2d at 203 n. 8; *Zuniga*, 812 F.2d at 452; *Robinson*, 808 F.2d at 1126; *Dreis & Krump Mfg. Co. v. International Ass'n of Machinists*, 802 F.2d 247 (7th Cir.1986) (applying *de novo* standard without discussion); *Golden Eagle*, 801 F.2d at 1538. *Cf. Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir.1987) (*en banc*) ("Whether (1) factual or (2) dilatory or bad faith reasons exist to impose Rule 11 sanctions is for the district court to decide subject to review for abuse of discretion ... [A] decision whether a pleading or motion is legally sufficient involves a question of law subject to *de novo* review by this court.") (footnote omitted) (*citing Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174–75 (D.C.Cir.1985)).

Second, we must consider whether the sanction the district court chose to impose was appropriate. 'The amount or type of sanction imposed is within the district court's discretion.' *Thomas [v. Capital Sec. Services, Inc.]*, 812 F.2d [984] at 989 [5th Cir.1987]. Therefore, we will reverse a district court's choice of an amount or a type of sanction only if we find an abuse of discretion. *See Cheek v. Doe*, 828 F.2d 395, 397 (7th Cir.1987) (per curiam); *accord Donaldson*, 819 F.2d at 1557; *Zuniga*, 812 F.2d at 452; *Robinson*, 808 F.2d at 1126; *Golden Eagle*, 801 F.2d at 1538."

Applying these guidelines, initially we note that there is no dispute as to the soundness of the district court's factual finding that counsel for MESA failed to review each of its contracts with the defendants prior to filing its complaint, a review which would obviously have led to their discovery of the defendant's true employment status. Thus, under *Brown*, we proceed to a *de novo* review of the question of whether the trial court properly found that this conduct constituted a Rule 11 violation. *But see Matter of Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir.1987) ("[w]e apply a deferential standard on review of the question whether the filing of a paper violated Rule 11") (citing *R.K. Harp Investment Corp. v. McQuade*, 825 F.2d 1101, 1103 (7th Cir.1987)).

■ As we explained in *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir.), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988), Rule 11 contains several strands:

"There must be 'reasonable inquiry' into both fact and law; there must be good faith (that is, the paper may not be interposed 'to harass'); the legal theory must be objectively 'warranted by existing law or a good faith argument' for the modifi-

cation of existing law; and the lawyer must believe that the complaint is 'well grounded in fact'. The attorney filing the complaint or other paper must satisfy all four requirements."

MESA's conduct in the instant case calls into question the first duty imposed under Rule 11: whether or not its attorney made a reasonable inquiry into the facts underlying its complaint. In making this determination, a district court should consider:

"whether the signer of the documents had sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion, or other paper; whether the case was accepted from another attorney; the complexity of the facts and the attorney's ability to do a sufficient pre-filing investigation; and whether discovery would have been beneficial to the development of the underlying facts."

*Brown*, 830 F.2d at 1435. Our review is based on an objective standard as to whether, in light of these factors, the sanctioned party's conduct was reasonable under the circumstances. *Id.* Considering the factors enumerated above, we note that: (1) MESA's attorney plainly had "sufficient time for investigation" as a brief review of each defendant's contract of employment would have revealed the movants' status as independent contractors; (2) Because the information about the defendants' employment status was contained on the face of their contracts with MESA, MESA's attorney was not required to rely on its client for this part of the factual foundation underlying its complaint; (3) The facts underlying the inquiry into the defendants' employment status were not complex and were readily available; and (4) Discovery of the information would have helped the plaintiff to develop and understand the underlying facts since its fraud claims were premised to a large degree on the defendants' alleged status as "employees" of MESA.

Based upon our examination of the factors set forth in *Brown*, we agree with the district court's finding that the conduct of MESA's lawyer in failing to investigate

each defendants' employment status before naming them as "employees" in their complaint can only be described as careless. As the court noted, a simple review of each defendant's contract with MESA would have verified their employment status. Because of the importance of that status to MESA's fraud claim, we are convinced that "a reasonable inquiry" should have included such a review. Thus, under the objective standard of Rule 11, the trial judge properly imposed sanctions upon MESA's attorney.

■ MESA also urges this court to overturn the trial court's order imposing sanctions in light of defense counsel's failure to attempt a private resolution of the problem before filing the Rule 11 motion. While we do not condone the immediate filing of a Rule 11 motion as an automatic response to an opponent's pleading error, we are convinced that under the circumstances of this case, the defendants' decision to swiftly file the motion does not warrant overturning the district judge's findings. As the trial court properly noted, since the defendants' true employment status was central to the plaintiff's fraud theory, the defendants were required to expend an unnecessary amount of valuable legal research and time defending those fraud claims that were premised on the defendants' alleged status as "employees." We agree with the trial court's refusal to prohibit an award of sanctions on this basis.

■ The final step in our analysis is to determine whether the district court's award of sanctions in the amount of $1,500 constitutes an abuse of discretion. *Brown*, 830 F.2d at 1434. As we pointed out in *Brown*, Rule 11 is designed not only to compensate the wronged party, but also to deter frivolous litigation and the abusive practices of attorneys. *Id.* at 1437–38. In this case, the district judge specifically stated that "the court ... awards $1,500 which the court estimates is the reasonable attorney's fee for the preparation for the Rule 11 motion." In our view, the amount of the sanction imposed by the district judge is most reasonable and comports

with the dual goals of compensation and deterrence, and thus does not constitute an abuse of discretion. Accordingly, the decision of the district court is

AFFIRMED.