**STANLEY GUDYKA SALES CO., INC., Plaintiff,**

v.

**LACY FOREST PRODUCTS COMPANY, et al., Defendants.**

No. 84 C 5165.

United States District Court, N.D. Illinois, E.D.

May 2, 1988.

See also 621 F.Supp. 772.

---

Roger C. Goble, David J. Axelrod, Goble & Axelrod, Highland Park, Ill., Albert Koretzky, Chester A. Lizak, DiMonte & Lizak, Chicago, Ill., for plaintiff.

Paul D. Frenz, Marc Fogelberg, McBride, Baker & Coles, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Stanley Gudyka Sales Co., Inc. ("Gudyka") has sued Lacy Forest Products Company ("Lacy") and its partners [1] for breach of contract. After extended discovery during the well over three years' pendency of this action,[2] and after this Court had received the Final Pretrial Order ("FPTO") jointly prepared by the litigants,[3] Gudyka was given leave to file a Third Amended Complaint adding two new theories of recovery.[4]

---

1. Lacy is a partnership comprising five Oregon corporations: Wickman Investments, Inc., Ted Saunders Investments, Inc., D.T. Mitchell Investments, Inc., Dan Burdett Investments, Inc. and L.E. Bunger Investments, Inc.

2. It was not until March 31, 1987 that the case (then nearly three years old) was assigned to this Court's calendar. Though it had been represented at that time as "ready for trial," that proved to be inaccurate, so this Court set a schedule for the close of all further discovery.

3. That initial FPTO was received by this Court December 15, 1987. Almost immediately thereafter (on December 18) a pretrial conference was held to review the parties' joint proposal, resulting in some revisions suggested by this Court to be embodied in a revised FPTO (no further discovery was involved in those changes). Under this Court's standard procedures, however, the case's priority for trial was established by the December 15 tender and the December 18 conference. Those dates, then, set the time frame against which the reasonableness of Gudyka's and its counsel's conduct should be viewed. As for the ultimate revised version of the FPTO, that was signed by the parties February 11, 1988 and received this Court's final approval February 25.

4. Initially this Court denied leave to amend because of (1) the advanced procedural posture of the action when Gudyka sought to expand the dispute (once the FPTO had been prepared by the parties and approved by this Court subject to the minor conforming amendments suggested at the pretrial conference, the case was really ready to be set for trial in the near future) and (2) Gudyka's failure to tender the proposed

Lacy has now moved for judgment under Fed.R.Civ.P. ("Rule") 56 on both new theories and, predictably, for sanctions under Rule 11. For the reasons stated in this memorandum opinion and order, Lacy's motion for partial summary judgment is granted and Gudyka is found to have violated Rule 11.

### Facts [5]

Gudyka is a manufacturer's representative for wood and lumber products. Its principal is Stanley Gudyka ("Stanley"). Lacy is a wholesaler of lumber products.[6] In July 1981 Lacy and Gudyka entered into an oral agreement for Lacy to use Gudyka as its representative for some products.

About February 1, 1983 Gudyka and Lacy executed a written letter agreement (the "Agreement"), which the parties agree "reduced to writing" their existing oral agreement (Third Amended Complaint ¶ 7; Rule 12(e) Statement ¶ 10). In part the Agreement said:

> The purpose of this letter is to confirm our mutual understanding of your employment by Lacy ... as an independent contractor. [Gudyka] will act as a commissioned representative in the sales of lumber, cutstock, millwork and related products....
>
> The purpose of your employment as an independent contractor is to represent [Lacy] with your best efforts for the purpose of selling lumber ... on a whole-sale basis, to a group of mutually agreed upon portected [sic] accounts. While this agreement is in force, it is agreed that you or any member of your company will sell ... only on behalf of [Lacy].
>
> You will be entitled a commission on all sales generated by you to your protected accounts computed as follows:
>
> Fifty percent (50%) of the net margin of each sale will be received by you and fifty percent (50%) by [Lacy]. Net margin will be computed as follows:
>
> Gross invoice amount less cash discounts allowed customer—less freight expense —less any returns and allowances to customer—less costs of material.
>
> All commissions due your corporation will be computed and paid as soon as reasonably possible....
>
> You will be responsible for all your sales expenses, as will [Lacy].

In addition the Agreement held Gudyka blameless for bad debts on his sales, although his commissions on those sales were adjusted accordingly. Either party was permitted to terminate the Agreement "for just cause" on 30 days' notice.

On June 10, 1983 Lacy wrote Gudyka, attempting to terminate the agreement because Lacy believed Gudyka was withholding commissions it had received directly. Lacy said it would recoup its share of the allegedly withheld commissions by reduc-

---

amendment with his belated motion. On reconsideration this Court granted leave to amend in light of the discussion in the then-newly-decided *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 838 F.2d 904, 908–09 (7th Cir.1988), where our Court of Appeals suggested that courts should be very free in granting leave to file an amended complaint absent a showing of prejudice to the defendant.

**5.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in favor of the nonmovant—in this case Gudyka (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)). Here Gudyka has sought to complicate matters somewhat by its response to Lacy's Statement of Material Facts as to Which There Is No Dispute ("Rule 12(e) Statement"), submitted pursuant to this District Court's General Rule 12(e). Gudyka argues most of the Rule 12(e) Statement contains factual assertions that are either immaterial or inadmissible—but nowhere does Gudyka admit or deny their truth as mandated by General Rule 12(f). Such nonresponsiveness frustrates the purpose for which General Rules 12(e) and 12(f) were adopted in the first place, and the latter rule prescribes the result: All the factual assertions of Lacy's Rule 12(e) Statement are deemed admitted.

**6.** Both Complaint ¶ 4 (which was admitted in Lacy's Answer) and Third Amended Complaint ¶ 4 refer to Lacy as "in the business of selling, at wholesale, lumber and related wood products." Plaintiff's Statement Pursuant to General Rule 12(f) ¶ 7 ("Rule 12(f) Statement") and its supporting affidavit from Stanley say Lacy was a manufacturer's representative. It is unclear just why Gudyka seems to find the distinction legally significant. It is not.

ing the payments due Gudyka on commissions paid directly to Lacy, and it would then pay Gudyka the remaining commissions it had earned. After the termination notice, Lacy itself served Gudyka's former "protected accounts."

## Procedural History

This action was originally brought June 19, 1984 as a breach of contract suit, asking damages equal to Gudyka's lost share of commissions after Lacy's termination of the Agreement. On May 12, 1986 Gudyka amended its complaint to seek recovery on two counts: breach of employment contract and "wilful and wanton conduct." Gudyka justified its bringing the latter count by claiming it had discovered evidence of such conduct by the Lacy partners during discovery. One year later (on May 14, 1987) Gudyka sought leave to file a Second Amended Complaint deleting Count II because Gudyka was "convinced that [its] remedy lies in the action for breach of contract, and they wish to pursue only that remedy."

Finally, in January 1988 Gudyka came forward with the Third Amended Complaint that has triggered these motions. Count I now says the Agreement created a *partnership* between Gudyka and Lacy, so Gudyka's remedy lies in partnership law.[7] Count II sounds both in breach of contract and in unjust enrichment, based on Lacy's continued sales to the accounts Gudyka originally developed.

## Partnership Claim

Both sides concur that Count I's fate depends on whether a partnership existed between Lacy and Gudyka.[8] They have

also treated Illinois law as applicable in this diversity action—and it therefore is (*National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir. 1985)).

Two provisions of the Illinois Uniform Partnership Act (Ill.Rev.Stat. ch. 106–1/2, ¶¶ 6 and 7[9]) have particular relevance:

Act § 6(1). A partnership is an association of two or more persons to carry on as co-owners a business for profit.

Act § 7. In determining whether a partnership exists, these rules shall apply:

\* \* \* \* \* \*

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

\* \* \* \* \* \*

(b) as wages of an employee....

As the Illinois Supreme Court said in *Rizzo v. Rizzo*, 3 Ill.2d 291, 299–300, 120 N.E.2d 546, 551 (1954)(citations omitted):

[A]s between the parties, the existence of a partnership relation is a question of intention to be gathered from all the facts and circumstances.... Such factors as the mode in which the parties have dealt with each other; the mode in which each has, with the knowledge of the others dealt with other people, ...

thus correct that evidence showing that it turned down a partnership *in* Lacy is not directly probative as to whether the Agreement created a partnership *with* Lacy.

---

**7.** Apparently Gudyka believes it is in better shape under partnership law because of the fiduciary duties between partners. Of course if there were a partnership, Gudyka too would be held to the higher standard of a fiduciary. That being true, its own failure to forward Lacy's share of commissions promptly (if proved) might more easily be classified as a breach on Gudyka's part, undercutting its own claim.

**8.** Gudyka stresses it is not claiming the Agreement made it one of the partners in the Lacy partnership. Rather Gudyka asserts it and Lacy became partners with each other. Gudyka is

**9.** All further references to that statute will take the form "Act § —." That usage reflects the Illinois General Assembly's continued use of the "§" designation for a statute's internal numbering, even though the Smith–Hurd compilation of the Illinois statutes shifted over to "¶" a few years ago.

and the use of a firm name, ... have been deemed material in determining the existence of a partnership. The essential test, however, is the sharing of profits, ... but it is not necessary that there be a sharing of the losses in order to constitute a partnership.... Mere participation in the profits, however, does not of itself create a partnership.

Gudyka is unabashedly inconsistent as to whether evidence outside the four corners of the Agreement is admissible (or relevant) here. When Lacy raises extrinsic indications that the parties did *not* intend to create a partnership, Gudyka claims such evidence is barred by the parol evidence rule, so this Court may look only to the written Agreement. Conversely (and probably because the Agreement consistently uses terms such as "employment" and "commissions" rather than "partnership" and "shared profits"), P.Mem. 6 says this Court must "look through form to the substance of a transaction in order to ascertain the true relationship of the parties." Yet that "true relationship" may surely be manifested by what the parties *did*, not necessarily by the written Agreement alone!

However, it is not necessary to decide between Gudyka's contradictory positions to deal with the current motion. Either way Gudyka loses—and loses badly.

[1] There is nothing in the Agreement itself from which a factfinder could rationally infer the parties intended to create a partnership. It repeatedly refers to Gudyka as an "independent contractor" or "com-

missioned representative" of Lacy, and not as Lacy's partner. That terminology accurately describes the substance of the relationship evidenced by the Agreement. Throughout the document Lacy is cast as the superior and Gudyka as the subordinate, rather than the two firms being treated as coequal partners. For example, one attribute of partnership is the ability of each partner to bind the other (Act § 9), and the Agreement explicitly disavows Gudyka's ability to bind Lacy.[10]

Gudyka's only real argument that the Agreement evidences a partnership between Gudyka and Lacy is based on already-quoted Act § 7(4) and the parties' purported sharing of profits. Three factors torpedo that position:

1. In fact the Agreement does not call for *profit* sharing. It provides for sharing "net margins," a term defined to exclude both Lacy's and Gudyka's sales expenses. Similarly, a bad debt results only in Gudyka losing its commission on the sale, rather than its sharing in the loss.[11]

2. Under the Act, the presumption that shared profits create a partnership does not apply when the share is for "wages of an employee." Here the Agreement refers to Gudyka both as an employee and as an independent contractor. Either way, it was to receive its share of the commissions as payment for services rather than as a principal in the payor's business. Illinois courts have long recognized the distinction between "profits as profits" and profits as the measure of compensation for services

---

**10.** Gudyka points to Agreement language in which it agrees to indemnify Lacy from losses should it bind Lacy without approval, saying that gives it the power to bind Lacy in partnership terms. That is of course wrong. There are many circumstances in which the law (in order to protect innocent third parties) may allow an agent to bind a principal as to such third parties, even if the agency agreement does not give the agent actual authority to do so. Agency agreements therefore often contain language such as that used here for indemnification of the principal should the agent act outside the scope of its authority. But such language does not expand the scope of the agent's authority. All this should be contrasted with the partnership situation, in which each partner is treated

conceptually as both principal and agent, with full power to bind the other as an inherent attribute of the relationship.

**11.** Gudyka correctly notes a failure to share losses does not of itself negate the existence of a partnership. But the Agreement goes farther than absolving Gudyka from responsibility for losses of the joint enterprise. Instead Lacy bore the burden of bad debts on individual accounts, while Gudyka retained commissions on other accounts. Hence Gudyka was entitled not to a share of the enterprise's total profits, but rather to a commission on those sales that resulted in payment to Lacy.

(see, e.g., *Reed v. Engel*, 237 Ill. 628, 631, 86 N.E. 1110, 1111 (1909)).[12]

3. Even if the Agreement were viewed (as it cannot reasonably be) as calling for the parties' sharing profits as profits, that would not end the matter. Other indications must be considered as well. Here every other factor points away from the conclusion that a partnership existed:

(a) Gudyka could not bind Lacy.

(b) Losses on individual accounts accrued only to Lacy.

(c) Lacy controlled sales decisions, with Gudyka in a subservient position.

(d) There was no firm name or shared books.

And the list could go on.

■ In short, there is simply nothing in the Agreement even tending to suggest Lacy and Gudyka intended to create a partnership. And if matters beyond the Agreement (the parties' conduct) are considered, the picture is at least as clear. Perhaps the most obvious extrinsic indication that Gudyka and Lacy did not intend to create a partnership is that it took almost four years after suit was filed for Gudyka and its attorneys to dream up the claim. Of course any litigant is free to change the legal theory underpinning its claim. But here the crucial issue is one of intent—and if Gudyka really intended to be a partner with Lacy, it never hinted at that intent until 1988. Indeed both Gudyka and its principal Stanley consistently exhibited exactly the opposite intention:

1. In July 1981 Stanley wrote his customers (on Lacy stationery) announcing his "employment" by Lacy.

2. Gudyka rejected an earlier draft of the Agreement because it did not feel commissioned agents should share in bad debt losses.

3. No "partnership" meeting was ever held between Lacy and Gudyka.

4. Under an oral agreement between Gudyka and Lacy, the majority of sales were not dealt with under the Agreement. Instead Gudyka was compensated for sales from the Chico Mill plant based on a percentage commission totally unrelated to profit.[13]

All in all, every single shred of evidence points in one and only one direction: Lacy and Gudyka wanted to have Gudyka working as a commissioned sales representative. There was no intent to create a partnership, so none was created. Defendants are entitled to a judgment as a matter of law on Count I.

### Count II

Count II, though confusing, seems to assert dual claims for (1) breach of contract and (2) implied contract or unjust enrichment. Lacy seeks summary judgment only on the unjust enrichment claim, and it is clearly entitled to that relief.[14]

■ In a strikingly similar setting, *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985) (citation omitted) has both succinctly stated and applied the relevant law:

Unjust enrichment is a quasi-contractual theory of recovery. Under Illinois law, a plaintiff may not state a claim for unjust enrichment when a contract governs the relationship between the parties.

The fact that the agreement between Heinold and FCT did not explicitly provide for allocation of customers or commissions upon termination does not allow

---

12. D.Mem. 5–7 cites a number of Illinois cases applying the same principle in a variety of business contexts. P.Mem. 6–7 purports to "distinguish" those cases because none involves two manufacturer's representatives. Gudyka never explains why such a broadly applicable rule should be rendered inoperative merely because the parties happen to be manufacturer's representatives. Nor (of course) does Gudyka cite any authority even hinting at a different rule for the manufacturer's representatives' situation.

13. As n. 5 says, Gudyka's silence as to the truth of Lacy's assertion regarding the oral agreement on Chico Mill production means that assertion stands admitted. In this instance there is more than mere silence: Stanley himself testified to the different agreement for Chico Mill (Stanley Dep. 12).

14. Again the parties have treated Illinois law as controlling.

FCT to now invoke a quasi-contract remedy.

In this instance, of course, the contract between the parties did treat with how accounts would be handled on termination—they were to be the property of neither party. Lacy says (incorrectly) that strengthens its contention, while Gudyka says because the contract allows termination only for just cause, it does not govern when Lacy breaches.

But all this gets us back to a simple breach of contract action. If Lacy breached the Agreement, it will be responsible for damages under that contract and under contract law. However, *First Commodity Traders* teaches the very existence of the Agreement precludes the invocation of an implied contract.

As drafted, Count II impermissibly seeks to recover both under the Agreement and under the law of implied contract. In addition to 100% of the post-termination commissions Lacy received from Gudyka's protected accounts (Gudyka apparently perceives that as the appropriate measure of unjust enrichment [15]), Count II seeks attorney's fees and 15% interest. Those latter components of relief have no basis in the law of implied contract, but are specifically conferred by the Agreement. Gudyka cannot have it both ways. Its only avenue of relief is for breach of contract.

To the extent Count II seeks recovery based on a theory of implied contract or unjust enrichment, Lacy is again entitled to a judgment as a matter of law. Because Lacy has not sought judgment on Count II

to the extent it seeks recovery for breach of contract, the case remains to be tried on that theory.

### Sanctions

Lacy seeks Rule 11 sanctions against Gudyka for filing the Third Amended Complaint, asserting it (1) was not well grounded in fact, (2) was not warranted by existing law or a good faith argument for its extension, modification or reversal and (3) was asserted merely to harass Lacy, cause unnecessary delay or needlessly increase the cost of litigation. Gudyka has chosen to ignore Lacy's sanctions motion, focusing instead on opposing summary judgment.[16] That may sometimes seem a reasonable approach to such a sanctions motion—after all, even if the substantive legal argument loses, the party advancing it may persuade the court it was at least colorable and made in good faith. But for a litigant to adopt that approach on its own—without explaining why and without asking the court's permission to do so—has to be considered risky business (if not downright foolhardy).

Gudyka's Third Amended Complaint was filed extraordinarily late in the day—as already explained, actually post–FPTO (thus after the watershed point that triggers the case's availability for an early trial setting). As such, the new pleading may fairly be held to a higher standard under Rule 11 than an earlier filing:

1. Discovery had been completed, so there would be no excuse for a complaint not well-grounded in fact.[17]

**15.** While the parties have not focused on the issue, the purported unjust enrichment is really Lacy's "expropriation" of Gudyka's customer list. Even though that list may have a value subject to proof, at best it is likely to be substantially less than the post-termination commissions Lacy received. First the costs of serving the accounts (including the cost of services formerly provided by Gudyka) would have to be netted out. Then the residual figure would have to be discounted to present value. In addition an adjustment (perhaps substantial, or perhaps even total) would have to be made to reflect Lacy's potential ability to identify and develop the accounts without expropriating Gudyka's list. After all, Gudyka had no property interest in the accounts themselves—only in the list.

**16.** Indeed, instead of offering even a word of response to Lacy's Rule 11 motion, Gudyka asked for Rule 11 sanctions against Lacy's attorney in the concluding paragraph of its brief. That request is really flippant, and the grounds it asserts are less than specious. Had Lacy's counsel stooped to answering Gudyka's throwaway request, he would certainly be entitled to recover from Gudyka's counsel for the effort. Luckily for Gudyka's counsel, Lacy simply ignored the spurious claim.

**17.** Rule 11 requires a belief, based upon reasonable investigation, that a complaint is well-grounded in fact. By definition the potential for "reasonable investigation" before a complaint is first brought has to be far less than the

2. Because so much time had elapsed from the case's initial filing date, there is no excuse for cursory research into the legal theory to be advanced. That really applies with special force here: Gudyka had changed theories several times and should have been on notice that it was long past time to decide.

3. Filing an amended complaint after agreeing to the FPTO and placing a case on the court's trial call is inherently disruptive to both court and litigants, strongly suggesting either (a) counsel has seen a probable loser after finally looking carefully at the facts and law of the case as structured, and is therefore grasping at straws,[18] or (b) a deliberate attempt by the litigant or counsel, or both, to delay the action.

If the partnership count here had been brought as part of an original complaint, it might be a close question whether it would merit sanctions. Even at that early stage the obvious critical deficiency would be that the Agreement on its face does not even come close to creating a partnership.[19] While competent counsel might initially have explored the possibility of a claim based on partnership, that possibility (at least based on the Agreement) should have been quickly dismissed.

At the initial pleading stage, that deficiency might be excused if counsel could show (1) a reasonable belief, based on information from the client, that other facts negated the express terms of the Agreement or (2) the existence of extraordinary time constraints that had precluded legal review or perhaps (3) some other reason for the legally ungrounded claim. But here there can be no excuse. Counsel was in no hurry.[20] Moreover, the fruits of discovery certainly did not support the new claim— every indication outside the Agreement also points away from the existence of a partnership. All the objective evidence suggests counsel simply did no legal research. Gudyka's position, based primarily on the statutory presumption that a partnership existed when profits were shared, was not even marginally tenable.[21] Gudyka never cited any case authority suggesting its position was warranted. Instead it was reduced to feeble attempts to distinguish the collection of well-established au-

---

situation when discovery has been completed. Thus it may be entirely reasonable for a plaintiff and its counsel to believe at the outset that their complaint is factually well-grounded, only to learn during discovery that a critical predicate is missing. After discovery is completed and distilled into a FPTO, that simply should not happen. At that point the attorney should be able easily to identify any evidentiary gap that would certainly defeat the new complaint and that should therefore cause the attorney to forgo its filing.

**18.** One of the familiar phenomena of judicial calendar management is the large percentage of cases that settle during or immediately preceding the week in which the FPTO is due (a due date always set by this Court several months in advance, normally to follow by about five weeks a realistic close-of-discovery date established with the concurrence of all counsel). Apparently when counsel are forced to sit down and compare what must be proved at trial with the available evidence, settlement begins to look more attractive than going to trial. Settlement after the close of discovery is of course the normal and wholly acceptable way to discount the risks of litigation, including cases that appear downright unwinnable (even though it might be more economic to reach that point

sooner). But filing a legally frivolous amended complaint and thus prolonging the agony is neither normal nor acceptable.

**19.** In *Medical Emergency Service Associates, S.C. v. Foulke,* 844 F.2d 391, 398 (7th Cir.1988) (*"MESA"*) the complaint alleged certain defendants were employees of the plaintiff when they were in fact independent contractors, as evidenced by their written contracts. Our Court of Appeals evaluated counsel's prefiling investigation in light of the factors enumerated in *Brown v. Federation of State Medical Boards,* 830 F.2d 1429, 1435 (7th Cir.1987) and concluded sanctions were appropriate. Had the ill-conceived complaint here been filed four years ago, such an evaluation would be appropriate. But such a factor-by-factor evaluation would be overkill here. On each factor, counsel's shortcomings are far more severe than those found sanctionable in *MESA.*

**20.** More precisely, if counsel *was* in a hurry to file without doing his homework after almost four years of costly litigation, that was inexcusable. There had been plenty of time to do legal research.

**21.** None of Gudyka's other assertions even approached the level of marginal tenability.

thority to the contrary proffered by Lacy (see n. 12).

Of course Rule 11 does not provide sanctions if a legal position is predicated on a good faith argument for the extension, modification or overruling of existing law. But that potential escape hatch provides no relief for Gudyka either. First, Gudyka never advanced any such argument. Second, even had it done so the argument would have been totally misplaced. This is a diversity action, where this Court's duty is to divine and apply Illinois law—not to make new state law, and certainly not to override or jettison or ignore a long-settled body of such law (see generally *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam); *Diversified Technologies Corp. v. Jerome Technologies, Inc.*, 118 F.R.D. 445, 451 & n. 7 (N.D. Ill.1988)).

In sum, Count I should never have been brought when it was. By doing so Gudyka's counsel violated Rule 11.

Count II's unjust enrichment claim is equally subject to sanctions. If anything, counsel's arguments to support that claim are more attenuated than those advanced on the partnership claim. In essence Gudyka relies on Lacy's alleged breach of an acknowledged contract to say there was *no* contract governing the relationship, thus (!) entitling Gudyka to relief in quasi-contract. Again Gudyka offers no authority supporting its extraordinary contention, but rather tries in vain to distinguish the cases cited by Lacy.[22]

This is a breach of contract claim, and that is all it is. Addition of an implied contract claim represents nothing more than a legally insupportable effort to inflate the damages over those provided by contract law. Moreover, even if the law of

unjust enrichment did apply, the damages sought appear unrecoverable on accepted principles (see n. 15 and accompanying text). Once again Rule 11 has clearly been violated.

Lacy has not submitted a claim for the financial burden it incurred in filing and pursuing its motion for summary judgment on the Third Amended Complaint. It is instructed on or before May 12, 1988 to file (in this Court's chambers) and to serve upon opposing counsel a statement of the attorney's fees and other expenses for which it seeks recovery.[23] This action is scheduled for a status hearing at 9 a.m. May 23, 1988, to determine whether formal objections and perhaps an evidentiary hearing are necessary.[24]

### Conclusion

Defendants have shown there is no disputed material issue of fact as to Count I and as to the unjust enrichment claim of Count II. They are entitled to a judgment as a matter of law on each. Accordingly, Count I is dismissed with prejudice, and Count II is dismissed except to the extent it states a claim for breach of contract.

Gudyka violated Rule 11 by filing the Third Amended Complaint, and Lacy is entitled to recover its expenses in seeking summary judgment on the new claims. Ascertainment of the amount of that recovery will await the procedure specified in the paragraph of this opinion immediately preceding this "Conclusion" section.

---

**22.** In fact P.Mem. 9–15 cites *only* the same cases cited in D.Mem., suggesting Gudyka's counsel did not do any independent legal research even after facing the summary judgment motion. Rule 11 requires counsel to do research *before* filing a complaint, rather than "file first and think later" (*In re TCI Ltd.*, 769 F.2d 441, 442 (7th Cir.1985)). Had that been done here, counsel would have known better than to file the claim.

**23.** That statement should of course be accompanied by a printout or typed schedule showing the lawyers' time involvement, coupled with information as to the proposed hourly rates, plus appropriate detail as to any out-of-pocket expenses.

**24.** This procedure is intended to minimize, if not eliminate entirely, the prospect of fees on fees—what would seem wasteful satellite litigation.